**BOSTON INSULATED WIRE & CABLE SYSTEMS, INC.,**
Petitioner-Cross-Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,**
Respondent-Cross-Petitioner.

No. 82–4420
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

April 25, 1983.

Rehearing and Rehearing En Banc
May 31, 1983.

---

Robert G. Hulteng and Joseph A. Schwachter, San Francisco, Cal., for petitioner-cross-respondent.

Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., for respondent-cross-petitioner.

Petition for Review and Cross Application for Enforcement of an Order of the National Labor Relations Board.

Before GEE, RANDALL and TATE, Circuit Judges.

RANDALL, Circuit Judge:

The petitioner, Boston Insulated Wire and Cable Systems, Inc. ("Boston Insulated"), seeks review of a National Labor Relations Board order that it bargain with the General Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union No. 653. The petitioner refused to bargain with the union, in order to secure review of the Board's denial of a hearing on the petitioner's claim that the representation election should have been set aside because of improper electioneering by the union. The Board has cross-appealed, seeking enforcement of its order. For the reasons set forth below, we deny review and grant the Board's request for enforcement.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

The petitioner is engaged in the manufacture, sale, and distribution of insulated wire and related products at its facility located in Plymouth, Massachusetts. In addition, the company operates a warehouse in Conroe, Texas. We have jurisdiction over the petition for review under section 10(e) and

(f) of the National Labor Relations Act, 29 U.S.C. § 160(e), (f) (1976).[1]

On February 26, 1981, the Board conducted a representation election at Boston Insulated's Plymouth facility. Of the 135 production and maintenance employees who participated in the election, sixty-nine voted for the union and sixty-six voted against it. On March 5, the company filed timely objections to the election.[2]

In support of its objections, Boston Insulated submitted seven affidavits from company employees describing the events surrounding the election. The balloting took place in a room that was located on the ground floor of the company's Building # 2. Directly in front of the polling place was a stairway leading to the main entrance of the building; the stairway was at one end of a corridor. Ten feet down this corridor was a set of wooden doors that had two glass panels at eye level; the doors opened onto the company parking lot. Through these doors, a person standing in the parking lot could view the corridor, the entrance to the polling place, and parts of the polling place itself.

Boston Insulated submitted affidavits that stated that, during the balloting, union agents passed out a campaign leaflet and spoke to employees as the employees entered the building through either the main entrance or the glass-paneled doors on their way to vote or to work. As the line of employees waiting to vote backed up to the doors, which were closed, the union agents observed the voters through the doors and continued to pass out literature and talk to entering employees.

The acting regional director conducted an administrative investigation. On April 10, 1981, he issued a report recommending that the Board overrule the company's objections. The company filed exceptions to this report. On January 20, 1982, the Board adopted the acting regional director's findings and recommendations and certified the union as the employees' exclusive bargaining representative.

In a motion for reconsideration, filed on February 18, 1982, the company for the first time requested a hearing on its objections. Accompanying this motion, the company submitted additional affidavits. In its denial of the motion for reconsideration, the Board refused to consider the additional affidavits; it noted that the company had not alleged any unusual circumstances which would have justified the company's failure to submit these affidavits during the original investigation. The Board also noted that the company had not previously requested a hearing.

The company was subsequently charged with an unfair labor practice because of its refusal to bargain with the union. *See* 29 U.S.C. §§ 158(a)(5) and (1) (1976). The company admitted its refusal to bargain but denied the validity of the Board's certification. The Board granted the general counsel's motion for summary judgment, finding that the company had committed an unfair labor practice, requiring the company to cease and desist from interfering with the employees' organizational rights, and directing the company to bargain with the union.

## II. PRELIMINARY PROCEDURAL QUESTIONS.

Boston Insulated contends that it should not be required to bargain with the union

---

1. Section 10(f) provides in relevant part:

   Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside.

   29 U.S.C. § 160(f) (1976).

2. The company filed two objections: (1) that the election should be set aside on the basis of the union's improper electioneering; and (2) that the election should be set aside because the union had made material misrepresentations to the employees. The company has urged only the electioneering objection in its petition for review.

because the union election should have been set aside, or at least, that the company was entitled to a full evidentiary hearing on its objections to the election. As a preliminary matter, the Board notes that Boston Insulated did not request a hearing until it filed its motion for reconsideration of the Board's decision. Boston Insulated responds that such a request was not necessary; it maintains that it was entitled to a hearing once it had presented "*prima facie* evidence raising substantial material issues that would warrant setting the election aside." *NLRB v. Claxton Manufacturing Co.*, 613 F.2d 1364, 1365 (5th Cir.), *modified*, 618 F.2d 396 (5th Cir.1980).

The National Labor Relations Act does not specifically require the Board to conduct post-election hearings on objections to the conduct of elections. *NLRB v. South Mississippi Electric Power Association*, 616 F.2d 837, 839 (5th Cir.1980); *NLRB v. O.K. Van Storage, Inc.*, 297 F.2d 74, 76 (5th Cir.1961). The Board, however, has promulgated regulations authorizing a hearing on a party's objections to a representation election at the regional director's discretion:

> The action of the regional director in issuing a report on objections . . . may be on the basis of an administrative investigation or, if it appears to the regional director that substantial and material factual issues exist which, in the exercise of his reasonable discretion, he determines may more appropriately be resolved after a hearing, he shall issue and cause to be served on the parties a notice of hearing on said issues before a hearing officer.

29 C.F.R. § 102.69(d) (1981).[3] Neither the cases nor the regulations say whether an election challenger must specifically request a hearing in addition to presenting evidence of a prima facie case. *See, e.g., Claxton*,

*supra*. Since we conclude that the Board's decision not to hold a full evidentiary hearing with respect to the company's objections was not an abuse of discretion regardless of the company's failure to request a hearing, we need not determine today whether a request for such a hearing would normally be necessary.

■ Secondly, we hold that the Board properly determined whether the election should have been set aside solely on the basis of the affidavits submitted during the original investigation. The regulations governing the procedure for objections to an election provide that objections shall be filed within five days after the tally of the ballots has been furnished to the parties. "The party filing objections shall, upon request, *promptly* furnish to the regional director the evidence available to it to support the objections." 29 C.F.R. § 102.69(a) (1981) (emphasis added).[4] The submission of affidavits almost one year after the filing of the objections can hardly be considered "prompt." The record in this case does not contain any request by Boston Insulated to the acting regional director for an extension of time in which to submit additional evidence. Had the company made such a request, the regional director's decision whether to grant an extension would have been governed by an abuse of discretion standard. *Burns International Security Services, Inc.*, 256 N.L.R.B. 959 (1981); *Sambo's North Division Store No. 144*, 223 N.L.R.B. 565 (1976).

The administrative regulations further provide that "in a proceeding in which no hearing is held, a party . . . may append to its submission to the Board copies of documents *timely* submitted to the regional director and which were not included in the report and decision." 29 C.F.R. § 102.69(g)

---

**3.** While these proceedings were pending, the Board amended its regulations to make clear that a "hearing shall be conducted with respect to those objections or challenges which the regional director concludes raise substantial and material factual issues." 29 C.F.R. § 102.-69(d) (1982); *see also* 46 Fed.Reg. 45922 (1981).

**4.** Section 102.69 was amended in 1981 to reflect the Board's existing practice: "Within 5 days after the filing of objections, or such additional time as the regional director may allow, the party filing objections shall furnish to the regional director the evidence available to it to support the objections." 29 C.F.R. § 102.69(a) (1982); *see* 46 Fed.Reg. 45922 (1981).

(1981) (emphasis added).[5] While a party may move for a reopening of the record under "extraordinary circumstances," 29 C.F.R. § 102.65(e)(1) (1981), "no motion for reconsideration or rehearing will be entertained pursuant to this paragraph ... by the Board with respect to any matter which could have been but was not raised before it .... Only newly discovered evidence, evidence which has become available only since the close of the hearing, or evidence which the ... Board believes should have been taken at the hearing, will be taken at any further hearing." *Id.; see also Claxton, supra,* 613 F.2d at 1368 n. 5. Boston Insulated has never offered any reason for its failure to submit the additional affidavits during the original investigation. There is no indication that the evidence was initially unavailable, as all of the affiants were employees of the company and indeed some had already signed earlier affidavits.

■ In light of the company's failure to explain why it had not timely submitted the affidavits, and the policy embodied in the National Labor Relations Act of expeditiously resolving questions of union certification, *see NLRB v. O.K. Van Storage, Inc.,* 297 F.2d 74, 76 (5th Cir.1961), we conclude that the Board's refusal to consider the additional affidavits was well within its discretion.

## III. THE ELECTION CHALLENGE.

■ Congress has entrusted the Board with wide discretion in determining whether an election has been conducted fairly, and the Board's decision is accorded special respect on review. *NLRB v. Claxton Manufacturing Co.,* 613 F.2d 1364, 1365 (5th Cir.), *modified,* 618 F.2d 396 (5th Cir.1980); *NLRB v. Golden Age Beverage Co.,* 415 F.2d 26, 29 (5th Cir.1969). An evidentiary hearing to determine the validity of objections to a Board-supervised election is required only "[i]f the objecting party shows, by specific evidence which prima facie would warrant setting aside the election, the existence of substantial and material factual issues which can be resolved only after an opportunity to observe and examine witnesses." *Golden Age, supra,* 415 F.2d at 32–33; *see also NLRB v. Sumter Plywood Corp.,* 535 F.2d 917, 924 (5th Cir. 1976). While the question whether a party has made an adequate showing is "a question of law and ultimately a question for the courts," *Claxton, supra,* 613 F.2d at 1365 (quoting *Luminator Division of Gulton Industries, Inc. v. NLRB,* 469 F.2d 1371, 1374 (5th Cir.1972)), "considerable weight must be assigned to [the Board's] determinations regarding the existence or nonexistence of substantial and material factual issues." *Claxton,* 613 F.2d at 1365–66 (quoting *NLRB v. Osborn Transportation, Inc.,* 589 F.2d 1275, 1282 (5th Cir.1979)). The Board's decision whether or not to hold a hearing will be disturbed only for abuse of discretion. *Golden Age, supra; NLRB v. Zelrich Co.,* 344 F.2d 1011 (5th Cir.1965).

■ A party seeking to overturn a Board-supervised election bears a heavy burden. Its allegations of misconduct must be supported by "specific evidence of specific events from or about specific people." *Golden Age,* 415 F.2d at 33 (quoting *NLRB v. Douglas County Electric Membership Corp.,* 358 F.2d 125, 130 (5th Cir.1966)). Further, "an election may be set aside only if the objectionable activity, when considered as a whole, either tended to or did influence the outcome of the election." *Claxton,* 613 F.2d at 1366; *see also Home Town Foods, Inc. v. NLRB,* 416 F.2d 392, 397 (5th Cir.1969).

The Board concluded in this case that Boston Insulated's evidence was insufficient to warrant an inference that the union's electioneering had interfered with the employees' free choice, and accordingly it re-

---

**5.** The amendments mentioned in note 4 added "a statement of the Board's policy that the failure timely to submit documentary evidence ... will preclude reliance on such evidence in a subsequent certification-test proceeding." 46 Fed.Reg. 45922 (1981). Section 102.69(g)(3) now reads in relevant part: "Failure to timely submit [the] documentary evidence ... to the regional director ... shall preclude a party from relying on such evidence in any subsequent related unfair labor practice proceeding." 29 C.F.R. § 102.69(g)(3) (1982).

fused to set aside the election. Since it was able to reach this conclusion while assuming that all of the company's evidence was true, it found no need to hold an evidentiary hearing. *See NLRB v. Carlton McLendon Furniture Co.,* 488 F.2d 58, 61 n. 4 (1974) (denying enforcement but noting that remand is unnecessary where operational facts are undisputed and matter presented is question of law, or effect of misconduct is apparent on record); *but see Hickory Springs Manufacturing Co. v. NLRB,* 645 F.2d 506, 510 n. 4 (5th Cir.1981) (one purpose of hearing is to resolve ambiguities in witness statements). While we have scrutinized the allegations of election misconduct somewhat more closely than we might otherwise have in light of the union's slim margin of victory in this case, *Sumter Plywood,* 534 F.2d at 924, our review of the record indicates that the Board's refusal to set aside the election or hold an evidentiary hearing on the company's objections was within its discretion.

■ Boston Insulated maintains that the election should have been set aside because the union violated the Board's prohibition on electioneering at or near the polls. *See Milchem, Inc.,* 170 N.L.R.B. 362 (1968). In *Milchem,* the Board established a "strict rule" against "prolonged conversations between representatives of any party to the election and voters waiting to cast ballots." *Id.* at 362. Subsequent Board decisions have emphasized that the *Milchem* strict rule against electioneering applies only where the objectionable conversations were prolonged, see *Cumberland Nursing & Convalescent Center,* 248 N.L.R.B. 322 (1980), and the conversations occurred at the polling place itself or while the employees were waiting in line. *See, Pastoor Brothers Co.,* 223 N.L.R.B. 451 (1976); *Harold W. Moore & Son,* 173 N.L.R.B. 1258 (1968); *Marvil*

*International Security Inc.,* 173 N.L.R.B. 1260 (1968). Where these precise factors are not present, the Board "makes a judgment, based on all the facts and circumstances, whether the electioneering substantially impaired the exercise of a free choice so as to require the holding of a new election." *Glacier Packing Co.,* 210 N.L.R.B. 571, 573 n. 5 (1974); *see also Moore, supra.*

■ As the Board noted in its decision, there essentially was no dispute in this case about what happened during the election. The company's evidence indicated that the electioneering had been conducted away from the polling place and had not been directed at employees who were waiting in line to vote. The Board stressed the fact that the voters standing in line were separated from the electioneering by a set of doors, which remained closed during the election.[6] Since the electioneering did not occur at the polling place or while the employees were waiting in line, the *Milchem* strict rule is inapplicable; instead, the effect of the conduct on the election must be judged in light of all of the circumstances surrounding that election. *See Glacier, supra; Moore, supra.*

The area immediately outside the doors had not been designated a no-electioneering area, a designation that is left in the first instance to "the informed judgment of the Regional Director and his agents conducting the election." *Marvil, supra,* 173 N.L.R.B. at 1261. The union representatives' presence outside the doors was not contrary to the instructions of the Board agent who was conducting the elections, see *Marvil, supra; Star Expansion Industries Corp.,* 170 N.L.R.B. 364 (1968); in fact, the company never complained to the agent about the union's activity during the election, when

---

**6.** Boston Insulated points out that the doors were opening and closing during the voting as employees entered the building. It emphasizes that the doors were opened repeatedly for fifteen-second periods and claims that they were open continuously for ten minutes at one point during the election. The fact that the doors were open for a few seconds at a time throughout the day does not significantly undermine the Board's conclusion that the doors were usually closed, or that they formed a physical barrier between the voters and the union representatives. The evidence that the doors were open for ten minutes was contained in the affidavits submitted after the original investigation; therefore, it should not be considered in our review of the Board's decision.

the agent might have been able to stop that activity.

Contrary to the suggestion made by the company, the Board's decision is not inconsistent with the precedent in this circuit or the prior decisions of the Board. *See Hickory Springs Manufacturing Co. v. NLRB,* 645 F.2d 506 (5th Cir.1981); *NLRB v. Carroll Contracting and Ready-Mix, Inc.,* 636 F.2d 111 (5th Cir.1981). In *Carroll Contracting,* the electioneering was directed to the employees who were waiting in line to vote, the situation directly addressed in *Milchem;* here, there was no evidence of communication between the union representatives and the voters waiting in line.

In *Hickory Springs,* there had been pervasive threats of violence before the election and threats were made to the voters near the polls on election day. *See also Eds-Idab, Inc. v. NLRB,* 666 F.2d 971 (5th Cir.1982). Here, there was no evidence of threats of violence. In its attempt to demonstrate that the union representatives' presence outside the doors was coercive, the most that Boston Insulated could produce was an affidavit from Jane Lopresti, who stated: "Through the windows [the men] were observing Company employees going into the assembly area to vote .... It is my personal feeling that with these Union men watching Company employees going to vote, this put a great deal of pressure on the voters." Record at 51. A man's glance through a glass-paneled door at a group of people waiting to vote is hardly the kind of threat or coercion normally considered sufficient to set aside an election. We cannot say that the Board's conclusion that Ms. Lopresti's statements did not indicate coercion sufficient to warrant an inference of interference with the exercise of the employees' free choice was unreasonable.

We note further that the union's distribution of the campaign leaflet was in response to the distribution of anti-union literature

the day before.[7] The only way the union could have effectively responded to the earlier anti-union message was to do what it did, i.e., pass out an answer to the voting employees on their way to, but not at, the polling place.

## IV. CONCLUSION.

In light of the undisputed evidence in this case: (1) that the electioneering was not directed to employees waiting in line to vote; (2) that the electioneering did not occur at the polling place or in a no-electioneering area; (3) that the company never complained to the Board agent during the election; and (4) that the Board agent never instructed the union not to pass out the literature, we hold that there is ample evidence in the record to support the Board's conclusion that the union's electioneering was not sufficient to warrant an inference of interference with the employees' free choice. Further, since the Board's conclusion was based on the company's own evidence accepted as true, we hold that the Board's refusal to conduct an evidentiary hearing on the company's objections was not an abuse of discretion.

Accordingly, Boston Insulated's petition for review is DENIED and the Board's request for enforcement is GRANTED.

ENFORCED.

---

**7.** The union thought that the company had been responsible for distributing the anti-union literature. The administrative investigation revealed that the employee who had passed out the leaflet had made copies of it on the company's photocopying machine without the company's knowledge. The company stopped the employee from distributing the leaflet in work areas as soon as it learned of his activity.